UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 07-CR 816 |
| vs. ) | Judge John W. Darrah |
| ) | |
| THOMAS SHUMATE ) | |

### DEFENDANT'S SENTENCING MEMORANDUM

### INTRODUCTION

Thomas Shumate entered his plea of guilty on January 22, 2008. Sentencing has been set for April 16, 2008, at 1:00 p.m. This is an action involving a violation of the Internal Revenue Code ("I.R.C."), 26 U.S.C. section 7212(a). The parties reached a plea agreement which left open one aspect of defining the loss at issue. The government's position is that the base offense level pursuant to the Sentencing Guideline sections 2T1.1(a)(1) and 2T4.1(I) is a 22 because the intended loss of $1,242,733 exceeds $1 million. The defense disagrees taking the position that only the actual loss of $718,495 should be used to calculate the loss amount resulting in a base offense level of 20. The computation difference is the consideration of over $450,000 which the defendant actually repaid to the Internal Revenue Service before being confronted with the investigation.

This memorandum also considers the probation report plus 2 for failing to report illegal income and the ultimate sentence to be imposed on Mr. Shumate.

SENTENCING LOSS CALCULATION

STATEMENT OF FACTS

Tom Shumate's company, Propay, Inc., was to prepare, file and, after collecting the employment tax payments from his clients, pay the clients' remitted amounts to the Internal Revenue Service (the "I.R.S."). The clients' funds were first deposited to Propay's escrow account from where they were to be forwarded to the I.R.S. The criminal circumstances began when Tom Shumate, in his mind, first borrowed money from the escrow account in order to pay his own tax debt and expenses. His intention was to repay the escrow fund. However, the indebtedness grew as Tom Shumate began using more escrow funds to pay his own company's employment taxes and other expenses. As notices for unpaid taxes were received from the I.R.S relating to his clients, Tom Shumate made payments to the IRS exceeding $450,000 from the funds currently held in the escrow account. As the indebtedness grew, the reality of not having the ability to repay the money became more apparent. Denial set in and Tom Shumate tried to ignore the problem by hiding in episodes of alcoholism. Mr. Shumate then realized he had no solution to solve the problem of repayment short of winning the lottery or some other windfall.

In the plea agreement the government takes the position that this $450,000+ Tom Shumate paid to the Internal Revenue Service should be considered an attempted loss for sentencing guideline purposes. The government does concede that these moneys were voluntarily paid to the IRS over a period of time before Mr. Shumate was contacted by investigating agents. We acknowledge that this money was not paid with the clients' original returns. However, Tom Shumate did pay over $450,000 from the escrow fund for credit to his victim clients' accounts. The defense position is that since the I.R.S. received these voluntary

2

payments from Tom Shumate and did credit them to his victims' accounts, this in excess of $450,000 should not be considered to increase the range of the Federal Sentencing Guidelines.

## ARGUMENT

I.  THE CALCULATION OF TAX LOSS SHOULD NOT INCLUDE PAYMENT OF OVER $450,000 TO THE GOVERNMENT BECAUSE INCLUSION OF THESE MONIES DOES NOT ACCORD WITH ECONOMIC REALITY.

A.  <u>The Definition of "Tax Loss" under Section 2T1.1 of the U.S. Sentencing Guidelines Should Not be Used Because it Causes an Irrational and Inequitable Result.</u>

Tom Shumate's plea agreement stipulates the use of section 2T1.1(a)(1) for sentencing purposes, but does not speak directly as to which definition of "tax loss" will be used under section 2T1.1. (Plea Agreement at 6). Shumate pled guilty to two counts of willfully filing a false I.R.S. form 941 in violation of 26 U.S.C. § 7212(a). (Plea Agreement at 2). Therefore, United States Sentencing Guideline ("U.S.S.G.") § 2T1.1(c)(1) applies for purposes of determining the tax loss. U.S. Sentencing Guidelines Manual § 2T1.1(c)(1) (2007). Under U.S.S.G § 2T1.1(c)(1), "tax loss" is defined as the "total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)." U.S. Sentencing Guidelines Manual § 2T1.1(c)(1) (2007). The "object of the offense" means the basis of the tax-loss figure is the attempted or intended loss and not the actual loss to the government. <u>U.S. v. Chavin</u>, 316 F.3d 666, 667 (7th Cir. 2002). The object of Tom Shumate's offense was the personal use of some of the escrowed funds and the deferral of the payment of employment taxes. His intent to eventually pay the deferred withholding is embodied in the fact that he filed returns and actually paid, albeit late, significant amounts of his clients' withholding taxes. However, under this definition, it is very difficult to measure the "loss that would have resulted" had this offense been successfully completed. Had Tom Shumate been successful in

3

repayment of all the escrow funds, the government would have received all of the withheld taxes without ever knowing Tom Shumate deferred payment of these taxes for personal reasons. Therefore, applying the definition of tax loss under U.S.S.G. § 2T1.1 would result in a tax loss of zero. A zero tax loss, though, is an inequitable and incorrect result because the government sustained an "actual loss" of $718,495. On the other hand, under the government's definition, the tax loss would be the "potential loss" to the government which encompasses all money initially deferred, including amounts voluntarily paid over to the government before their investigation began. This is also an incorrect and inequitable result because the government actually received this money and credited the amount to the victims' accounts. The government's position is essentially advocating that Tom Shumate would have been better off stealing all of the money outright and paying nothing over to the government since he is going to be punished as severely either way. This result is irrational. See U.S. v. Schneider, 930 F.2d 555, 559 (7th Cir. 1991).

In Schneider, a husband and wife successfully bid to receive two separate contracts to perform alterations in federal buildings. Schneider, 930 F.2d at 556. However, both contracts were obtained by lying on the bid application. Schneider, 930 F.2d at 556. The government discovered the lies before any work had commenced and Schneider was charged and convicted. Schneider, 930 F.2d at 557. Schneider was sentenced to 30 months imprisonment using a loss amount equal to the gross contract price. Schneider, 930 F.2d at 556. The Seventh Circuit held that the sentence should be reduced because the loss to the government was zero. Schneider, 930 F.2d at 558. The Court reasoned that because Schneider had previously fully performed around fifty contracts for the government, it wasn't his intent to simply abscond with all the money.

Schneider, 930 F.2d at 558. Therefore, using the same amount as a con artist who simply pocketed the entire contract price was irrational. Schneider, 930 F.2d at 559.

Though Schneider involves obtaining Government contracts under false pretenses, Tom Shumate's offense is more similar to this type of fraud or embezzlement than it is to tax evasion cases. Like Schneider, Shumate intended to fulfill his duty with respect to the Government. Like Schneider, Shumate deceived the government and exposed it to a risk of loss through misrepresentation. Like Schneider, Shumate deserves to be punished but punished fairly.

> B. The Tax Loss for Sentencing Purposes Should be Calculated using the Definition of Loss in Fraud and Embezzlement Cases Because Tom Shumate's Offense is More Akin to Fraud or Embezzlement than Tax Evasion.

As in many fraud and embezzlement cases, Tom Shumate obtained this money under false pretenses with the initial intent to repay. Tom Shumate's plan was to "borrow" the withholding, repay previous amounts due with new withholding collected, and eventually repay any amount due. This is similar to an employee who embezzles money from his employer intending to replace it before it is missed. When "tax loss" is defined by applying the definition of "loss" used in fraud cases, it becomes clear how to quantify the "loss" Tom Shumate caused to the Government.

Basing its decision on U.S. v. Schneider, the Sixth Circuit Court of Appeals defined loss from fraud not as the potential loss, but as the actual loss to the victim, or the intended loss to the victim, whichever is greater. U.S. v. Moored, 38 F.3d 1419, 1427 (6th Cir. 1994). The intended loss to the victim is the amount the defendant subjectively intended not to repay. Moored, 38 F.3d at 1427. In Moored, the defendant, James Moored ("Moored"), was granted a loan for about $1.7 million from a bank. Moored, 38 F.3d at 1420. Before the disbursement check was cashed, the lender stopped payment on it because the bank had learned Moored falsified

documents in order to secure the loan. Moored, 38 F.3d at 1420. At trial, Moored was convicted and sentenced using a loss of $1.7 million. Moored, 38 F.3d at 1421. The Sixth Circuit reversed and used a loss of zero. Moored, 38 F.3d at 1429. The Sixth Circuit reasoned that there was no actual loss since the loan was never disbursed, and there was no intended loss because nothing in the record proved Moored did not intend to repay the loan in full. Moored, 38 F.3d at 1420.

Tom Shumate, like Moored, obtained funds through deception and initially intended to repay the funds. Therefore, like in Moored, the "loss" Tom Shumate caused to the government should be defined as the actual loss or the intended loss, whichever is greater. If the additional $450,000+ Tom Shumate paid to the government is included in the loss calculation, Tom Shumate would be sentenced using the "potential loss" and punished as harshly as if he hadn't paid any money. However, defining "tax loss" using the definition of "loss" in fraud cases punishes Tom for the money not paid to the government, the actual loss in this case, but doesn't punish Tom Shumate for the money he did repay.

It is not a novel idea that in certain atypical situations the U.S.S.G. must be tailored to fit special circumstances. Under § 1B1.2 of the 1992 U.S.S.G., if a defendant was convicted under I.R.C. § 7212(a), the guideline directed the court to apply the section of the offense most analogous to the criminal conduct for which the defendant was convicted. U.S. v. Brennick, 134 F.3d 10, 13 (1st Cir. 1998). Additionally, Appendix A of the 2007 U.S.S.G. states that if more than one guideline is referenced for a conviction under a particular statute, the court should use the guideline most appropriate for the offense conduct charged. U.S. Sentencing Guidelines Manual Appendix A (2007). In fact, the Application Notes in the Commentary of U.S.S.G. § 2T1.1, the guideline which applies to this case, contemplates a situation similar to the current one where the definition of "tax loss" enumerated does not fit the "circumstances of the particular

case." U.S. Sentencing Guidelines Manual § 2T1.1 (2007). It states, "[i]f none of the methods of determining the tax loss set forth fit the circumstances of the particular case, the court should use any method of determining the tax loss that appears appropriate to reasonably calculate the loss that would have resulted had the offense been successfully completed." U.S. Sentencing Guidelines Manual § 2T1.1 (2007). "Tax loss" cannot be defined as the "potential loss" as the government contends. Instead, "tax loss" must be defined as the amount of money that Tom Shumate intended to permanently deprive the government or the actual loss he caused. This definition avoids punishing Tom Shumate for the amounts actually paid to the government.

This is not to say that Tom Shumate would not be punished if he had found a way to repay the withholding before the government discovered his plan. The Federal Sentencing Guidelines do not require a minimum loss to punish the wrongdoer, they simply "award bonus punishment points for different levels of proven loss." Schneider, 930 F.2d at 559. Tom Shumate would still be punished for the misappropriation of the funds and the additional risk of loss to the government from the misappropriation.

C. The Cases of United States v. Mount and United States. v. Frost are Incorrectly Relied on By the Government to Support Their Contention that Monies Paid to the Government by Tom Shumate Should be Included in Determining Loss.

The Government agrees that "tax loss" in this case should be defined in terms of fraud and not tax evasion. They cite two cases to support this contention. However, the Government also uses these cases to support the claim that an additional $450,000+ should be included in calculating the tax loss caused by Tom Shumate. Their reliance on these cases for the purpose of increasing the tax loss is misplaced.

In United States. v. Mount, John Mount ("Mount") agreed to purchase Minnesota Twins baseball tickets he knew were stolen for $30,000 from Gray. United States v. Mount, 966 F.2d 262, 264 (7th Cir. 1992). Gray was then to return $12,000, representing the price of the tickets, to the Twins' vault so the Twins would not realize the tickets had been stolen. Mount, 966 F.2d at 264. Because Gray was working for the government, Mount was apprehended and convicted. Mount, 966 F.2d at 264. The government's argument in Mount was that Mount did not care whether Gray returned $12,000 to the Twins' vault or not. Mount, 966 F.2d at 266. The court in Mount agreed that so long as the stolen tickets were honored at the game, it didn't matter to Mount if the Twins were repaid. Mount, 966 F.2d at 266. The court held that the "loss" was equal to at least $12,000 because Mount could not guarantee that Gray was going to return $12,000 to the Twins' vault. Mount, 966 F.2d at 266. Additionally, because Mount deprived the Twins of the choice to offer the tickets at a bargain price and thus depriving the Twins of the value they may have received from customers, the $18,000 markup was also included in the loss. Mount, 966 F.2d at 266.

The court's main reason for the holding as it did in Mount was because there was no way Mount could guarantee that Gray was going to put $12,000 back in the Twins' vault. Mount, 966 F.2d at 266. Therefore, due to Mount's offense, the Twins were always at risk to lose at least $12,000. Mount, 966 F.2d at 266. The situation in Mount is very different than Tom Shumate's. Tom Shumate actually paid the government $450,000+. The risk of non payment ceased for that amount. Tom Shumate's situation is akin to Mount taking the $12,000 and placing it in the Twin's vault himself. Had Mount taken those steps, the court may have held differently. In fact, the Court in Mount implied that had Gray put the $12,000 into the Twins'

vault before he gave the tickets to Mount, the loss would not have included this $12,000. See Mount, 966 F.2d at 266.

In Frost, the defendants lied on federal grant applications and student loan guarantee applications to obtain grants and loans for students of their accredited trade school. United States v. Frost, 281 F.3d 654, 655-56 (7th Cir. 2002). Because of the lies, the students fraudulently received grants and loans which were paid over to the trade school in satisfaction of tuition. Frost, 281 F.3d at 656. The defendants were found guilty and separately sentenced using different amounts of loss. Frost, 281 F.3d at 658-59. On appeal, the court held that the cost of the education the trade school provided to the students who benefited from the fraudulently obtained grants could not be deducted when calculating the loss to the government. Frost, 281 F.3d at 660. The court reasoned that but for the fraud, the government would not have been willing to subsidize the education of those students, therefore, it is incorrect to deduct the cost of education for those students when calculating the loss to the government. Frost, 281 F.3d at 659.

The crux of the defendants' argument in Frost was that any amount of education bestowed on students who received grants due to fraud should be deducted when calculating loss. See Frost, 281 F.3d at 659. The Seventh Circuit disagreed, stating that Frost was a case of "[r]ight items, wrong beneficiary." Frost, 281 F.3d at 659. The Court stated that the situation in Frost is akin to a grocer giving groceries to Donald Trump when Donald Trump pays using food stamps. Frost, 281 F.3d at 659. The Court in Frost did not allow the cost of education to be deducted from the gross loss because, while education is something the Government is willing to pay for, it was for the benefit of those persons for whom the government was unwilling to cover the costs. Frost, 281 F.3d at 659.

This is nothing like Tom Shumate's case. Like the defendants in Frost, Tom Shumate fraudulently received funds. However, unlike Frost, the funds were not given to Tom Shumate to provide services for a third party. The funds were given to him so that he would deposit the funds with the government. Money actually paid over to the government should not be included in the loss calculation since the government actually received the funds. Had some of the loans in Frost been repaid, the court likely would have allowed that amount to be deducted from the gross loss.

To define tax loss as "potential loss" and punish Tom Shumate as if he had absconded with the money instead of paying some over to the government is an irrational conclusion. It would be equally as irrational to define "tax loss" as zero since Tom Shumate intended to repay the money. Because this case is so similar to fraud or embezzlement, the most logical way to define "tax loss" is to use the definition of "loss" used in fraud cases. Therefore "tax loss" in this case would be the actual loss to the victim, or the intended loss to the victim, whichever is greater. Since the intended loss is zero, but the actual loss is $718,495, the tax loss to the government is $718,495.

PROBATION REPORT GUIDELINE INCREASE

The Presentence Report increased the Plea Agreement Sentencing Guideline by a plus 2 claiming the application of relevant conduct reflected a failure of Mr. Shumate to report more than $10,000 in any year from illegal income. The defense opposes this determination. First, this computation was not included in the Plea Agreement. Obviously, it was not considered by the United States Attorney or by the Internal Revenue Service even where the IRS is pursuing a

plus 2 in its "attempted loss" argument, supra. Second, while being charged under I.R.C. section 7212, the underlying facts and charges read like 2T1.6 failing to collect or truthfully account for and pay over tax, supra. 2T1.6(b)(1) refers to embezzlement by withholding tax from employees and willfully failing to account and pay over to the IRS. Sentencing hereunder in a tax matter refers to the theft schedule for appropriate Guidelines. Though it is a tax crime of embezzlement, the Guideline does not automatically refer to a plus 2 under the section cited by the probation report. Third, Mr. Shumate was not charged with underreporting his personal income tax. If that was the charge, even assuming the application of 2 T1.1(b)(1) would maximize the defendant's sentence at a 12 or perhaps a 14, a level less than what we have discussed. Under our circumstances, where the charge and sentence is pursuant to section 7212, this plus two enhancement is not appropriate. Fourth, under these circumstances the application of 2T1.1(b)(1) would seem to be duplicative to the reading of the charges and the plus 2 applied for a position of trust.

## SENTENCING FACTORS

1. Sentencing Guidelines. Pursuant to the Plea Agreement, the government's guideline range is 37-46 months. As noted in the Plea Agreement and the above analysis, the defense guideline range is 30-37 months. The parties recognize that the Federal Sentencing Guidelines are advisory to this Court.

2. Extraordinary acceptance of responsibility. After <u>Booker</u> made the Guidelines advisory, this Court has the discretion to grant a Guideline variance based on extraordinary acceptance of responsibility. <u>United States v. Severino</u>, 454 F.3d 206 (3d Cir. 2006). Mr.

Shumate's actions meet this standard and should be taken into consideration to reduce his sentence of imprisonment. Tom Shumate recognizes what he did was wrong and he is most remorseful for his shameful actions. While his personal life created numerous pressures ending in divorce and its financial repercussions, Tom Shumate recognizes this is no excuse for his actions. His actions have caused harm to a number of his former clients and the government. He realizes he will receive a sentence of imprisonment for his actions and that justice requires that remediation.

(a) Early surrender. Recognizing his actions deserved imprisonment, Tom Shumate entered his plea of guilty on January 22, 2008. Per his direction, defense counsel filed a motion to revoke his bond so Tom Shumate could surrender to the United States Marshal and begin serving his expected imprisonment. The motion was granted and on February 6, 2008, Tom Shumate surrendered. The Marshal's Office assigned him to the County Jail in Kankakee, Illinois, where he has been confined in a twelve cubicle section with 48 prisoners incarcerated for drug dealing, armed robbery, assault and battery, kidnapping, etc. The defense requests that this Court give Tom Shumate credit for the time he has already served toward his ultimate sentence. The defense also requests that the Court recognize the stringent circumstances of his county jail confinement in fashioning the final sentence.

(b) Expedited consideration. In the usual IRS criminal investigation special agents conduct a lengthy investigation and prepare a special agent's report with all the exhibits as a prelude for review and trial preparation. If the special agent refers the case for prosecution, the defense is entitled to a conference with the area chief, the special agent in charge of this region. If that review results in a referral, then the case is sent to the United States Department of Justice in Washington D.C. where the defense is entitled to another conference. Finally, only after these

reviews with defense counsel is the matter referred to the local United States Attorney's Office for review and prosecution. After being contacted by the Internal Revenue Service, Tom Shumate met with counsel and advised he wanted to cooperate with the Internal Revenue Service and have his case expedited to resolution. Per this direction, defense counsel met with the I.R.S. investigating agents and their superior over a year ago [January 2007] to advise of Shumate's determination, lessening the need for investigation and waiving all reviews before the Internal Revenue Service and the Department of Justice. Because of the I.R.S. inability to move quickly, defense counsel himself at the IRS request had the matter expedited to the United States Attorneys Office. Even under these circumstances the I.R.S. agents did not even interview Tom Shumate until June, 2007. Mr. Shumate has fully cooperated by furnishing his documents, giving interviews, explanations and guidance in assisting the I.R.S. and the United States Attorney.

(c) Restitution. Tom Shumate even prior to his meeting with the I.R.S. began restitution by direct repayment to some clients. He has paid all available funds to the I.R.S. including the then available proceeds from the sale of his payroll business, in excess of $40,000. As a means to compensate his individual clients, he directed the Internal Revenue Service to transfer $280,000 in payments made toward his company's payroll tax account at the I.R.S. to be credited to the accounts of his victim clients. Since these credits would be applied to the individual victim clients' accounts at the time Tom Shumate made his tax payments, this would significantly reduce the amounts those clients would owe the Internal Revenue Service. These credits would not only eliminate tax but also years of penalties and interest due the I.R.S. from those victim clients. Tom Shumate thus would bear the burden and he will have to pay the Internal Revenue Service personally starting upon his release from imprisonment. Tom Shumate

even signed Internal Revenue Service statute of limitations extensions to give the I.R.S. more time to process any needed collection actions against him. Unfortunately, while he has focused his efforts to assist the government in making restitution, at this time he no longer has assets to make all victims whole. We appreciate the government's version candidly acknowledging that Tom Shumate "has made every attempt to repay the I.R.S."

(d) Cooperation—source of information. As part of his cooperation Tom Shumate voluntarily has provided information he previously acquired about four other business taxpayers and six personal taxpayers concerning their questionable and likely fraudulent tax activities. These tax deficiencies likely would exceed the total amount at issue in this case. Tom Shumate was not a participant in these other taxpayers' activities in failing to report their correct income and tax. It is believed the Internal Revenue Service has taken these cases under review. While these have been referred to in the Plea Agreement, no current direct sentencing credit has been given to Tom Shumate because no matter is pending in the United States Attorney's Office and the Internal Revenue Service moves at its own pace in investigating such circumstances. Defense counsel's experience suggests that in due course the Internal Revenue Service could prosecute and, at least, likely will recover significant tax, penalties and interest from these leads furnished by Tom Shumate.

3. Because of his past alcohol issues, as part of his imprisonment sentence Thomas Shumate requests that he be allowed to participate in an alcohol abuse education and treatment program and he requests this Court to recommend such a program. This issue is a life time issue Tom Shumate must face and resolve.

4. Finally, as reflected in the presentence report and letters, Tom Shumate was a sexually abused victim of a Catholic priest during his high school years. While in itself that may not be a

sufficient reason for reducing his sentence, it certainly has had a deep adverse effect on his life. During the period of this offense the matter certainly was on his mind because potential litigation involving Tom was pending and which was finally settled in 2005.

Tom Shumate recognizes he must serve a term of imprisonment before he can renew his life in society and make good on the balance of his restitution—which he intends to do. He no longer has his CPA license but he intends to find gainful employment upon his release to accomplish his promise in good faith. He again expresses his remorse and asks this Court to consider his more current actions in sentencing him to imprisonment. The defense respectfully requests a period of incarceration between 18 to 24 months. Whatever the Court's decision he thanks the Court for its consideration.

Respectfully submitted,

s/ Theodore A. Sinars
Attorney for Defendant

Madden, Jiganti, Moore and Sinars
190 South LaSalle Street
Suite 1700
Chicago, Illinois 60603
312/346-4101

CERTIFICATE OF SERVICE

I, Theodore A. Sinars, on oath state that on April 8, 2008 I served a copy of the foregoing Defendant's Sentencing Memorandum upon Assistant United States Attorney Lisa Noller, 219 South Dearborn St., 5th Floor, Chicago, Illinois 60604 by messenger delivery.

s/Theodore A. Sinars