UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 07 CR 816 |
| | ) | |
| THOMAS SHUMATE | ) | Judge John W. Darrah |

**UNITED STATES' RESPONSE TO**
**DEFENDANT'S SENTENCING MEMORANDUM**

The United States of America, by its attorney, United States Attorney Patrick J. Fitzgerald, hereby responds to defendant's sentencing memorandum as follows:

**I.    Background**

**       A.    Counts One and Two**

       Defendant was charged with, and pleaded guilty to, two counts of corruptly obstructing and impeding the due administration of internal revenue laws, by obtaining his clients' money to which he was not entitled, by wilfully filing false IRS Forms 941, by making partial payments to the IRS any by diverting money for his own purposes, in violation of Title 26, United States Code, Section 7212(a).  In sum, Shumate collected payroll taxes from his clients, but did not turn over 100% of those collections to the IRS as he was supposed to have done, because he spent the money for his own expenses.

       More specifically, defendant admitted in his plea agreement that from in or around 2001 through on or about December 31, 2006, he was the sole owner and operator of Propay, Inc., an S-Corporation doing business in Gurnee, Illinois.  Shumate's responsibilities on behalf of his clients included the preparation and filing of tax returns, including the preparation of IRS Form 941, the Employer's Federal Quarterly Federal Tax Return.  Shumate was also obligated to account for and

pay over any payroll taxes (withheld federal income tax and both employee and employer shares of social security and Medicare taxes, hereafter, "941 Amounts") collected from his clients and due and owing to the IRS.

Shumate agreed to act as a taxpayer representative for at least approximately 34 corporate clients who were obligated to pay payroll taxes to the IRS. In his capacity as a taxpayer representative, Shumate contracted with clients to calculate their payroll taxes due and owing to the IRS, and agreed to account for and pay over any 941 Amounts due and owing to the IRS.

Between 2001 and 2006, Shumate collected approximately over $1 million in 941 Amounts from his clients. Shumate, however, falsely represented to approximately 22 of his clients that he paid the IRS the funds he collected from the clients, when in truth and fact, he did not pay over to IRS those collected 941 Amounts. For approximately 23 of his clients, Shumate knowingly and wilfully prepared IRS Forms 941 that falsely understated the amount of 941 Amounts due and owing to the IRS. He knowingly and wilfully submitted these false forms to the IRS with the understated 941 Amounts. For approximately 8 of his clients, Shumate knowingly and wilfully failed to account for or file IRS Forms 941 or 941 Amounts, and did not file that form with, or pay the funds to, the IRS.[1] In each instance, Shumate falsely told his clients that he was paying over to the IRS the money they entrusted to him, when in truth and fact, he had intentionally diverted the funds. Attached at Exhibit A are four victim impact statements from Shumate's former clients, describing some of the effect Shumate's criminal conduct had on them. (The victim impact is discussed more fully herein in connection with the § 3553(a) analysis.)

---

[1] There is some overlap among these categories. For example, for some clients, Shumate sent false forms to the IRS and withheld funds.

Over the course of his scheme to defraud his clients and fail to collect and pay over 941 Amounts to the IRS, it is the government's position that Shumate caused an actual loss to IRS of $718,495, and an additional attempted loss of $479,742. Shumate acknowledges he caused an actual loss of $718,495.

B.   **Stipulated Offense**

In his plea agreement, Shumate also admitted that for the tax years 2001 to 2006, he was required by law to file truthful and accurate federal income tax returns, stating specifically the items of his gross income and any deductions and credits to which he was entitled. Shumate admitted that from the tax years 2001 to 2005, he knowingly and wilfully underreported $61,939 in gross income to the IRS that he derived from his scheme to collect and divert 941 Amounts during the same time period of 2001-2005, resulting in an additional loss to the IRS of $17,343.

C.   **Guidelines Calculations**

The Probation Department's Guidelines calculation adopted the government's position on loss amount, and added an additional two-level enhancement, as follows:

| | |
|---|---|
| 22 | base offense level, per USSG §§ 2T1.1(a) and 2T4.1 (Intended loss of $1,242,833) |
| +2 | failed to report income from criminal activity, per USSG § 2T1.1(b)(1) |
| +2 | abuse of trust, per USSG § 3B1.3 |
| -3 | acceptance of responsibility |
| **23** | **adjusted base offense level** |

PSR at lines 138-91. The Guidelines range is therefore 46-57 months. The government agrees with this calculation, and further notes that neither it nor the defendant contemplated the two-level increase under Guideline § 2T1.1(b)(1) at the time they entered into the plea agreement.

Defendant's calculations are based on actual, versus intended, loss, and do not apply the 2-level enhancement applicable to Shumate's crimes. Accordingly, the defendant believes he is an adjusted base offense level 19, for a Guidelines range of 30-37 months. He has asked for a variance to a sentence from 18 to 24 months.

## II.     Argument

### A.     The Two-Level Enhancement Under Guideline § 2T1.1(b)(1) Applies.

As noted above, the plea agreement did not contemplate the § 2T1.1(b)(1) specific offender characteristic (failing to report to the IRS income derived from criminal activity) for Shumate's offense. The government has since researched the issue, and agrees the two-level enhancement applies here. In *United States v. Vucko*, 473 F.3d 773 (7th Cir. 2007), defendant embezzled money from her employer, falsely reported her income on her tax returns, and pleaded guilty. On appeal, defendant challenged the application of § 2T1.1(b)(1), saying it should have been grouped together with her Guidelines calculation for failing to truthfully file tax returns. The Seventh Circuit analyzed the rationale behind the tax fraud section of the Guidelines, applied that analysis to defendant's case, and concluded that the two-level enhancement was not only appropriate, but also was contemplated by the Sentencing Commission. *Id.* at 776-81.

The court first cited to the Sentencing Commission's Commentary to the tax guidelines, noting in particular that because so many tax crimes occur without being prosecuted, courts should particularly consider the deterrent effect of the recommended sentences. *Id.* at 775-76. The court then noted (again, from the Guidelines Commentary) that an enhancement should be applied to defendants who failed to report proceeds of their crimes, because the tax loss in such cases may be understated, because such activity is a pattern of criminal activity and because a deterrence message

should be sent to others. *Id.* at 776. The court further analyzed cases from other circuits and the facts before it, and declined to group the fraud Guidelines and the specific offense characteristic, finding instead that the 2-level enhancement applied to the defendant's conduct.

*United States v. Ellis*, 440 F.3d 434 (7th Cir. 2006), is also illustrative. In *Ellis*, the defendant, bishop of the Apostolic Pentecostal Church, stole money from the church collections and was charged with five counts of filing false income tax returns. The district court applied the § 2T1.1(b)(1) enhancement, and defendant appealed. The Seventh Circuit ruled that even though he was charged with tax fraud, his unreported income was from theft, so the two-level enhancement was appropriate. *Id.* at 437-38.

The facts in *Vucko* and *Ellis* are similar to those before this court. Shumate was prosecuted under a tax Guideline, but his crime is essentially embezzlement. He collected his clients' money, then pocketed it for himself instead of sending it to its intended destination. At the same time, he failed to report his criminally-derived windfall to the IRS. Pursuant to the Guidelines and its commentary, as well as the law, the 2-level enhancement applies.

Defendant challenges the application because, since he was charged with violating 26 U.S.C. § 7212, the enhancement should not apply. However, he cites no support for his argument, and the *Ellis* case suggests his argument is without merit. Moreover, the Guidelines sentence a § 7212 violator is sentenced under Guideline § 2T1.1, which includes as a specific offense characteristic the two-point enhancement where the defendant makes money from the commission of a tax offense, then fails to report that additional income. That is exactly the situation in which Shumate placed himself, *i.e.*, he diverted his clients' money for his own personal use, then failed to report that criminally-derived income to the IRS.

B.   **The Loss Amount Should Include Intended Loss.**[2]

The parties disagree about whether the loss amount for Guidelines purposes should be $1,242,833 (actual loss + attempted loss + tax loss), or $718,495 (actual loss + tax loss). Essentially, the government (and Probation) contend that any amount Shumate diverted from its purpose - for any length of time - should be considered a loss for Guidelines purposes. The defendant, on the other hand, contends that since Shumate only planned to "borrow" his clients' money, the amounts he eventually paid over to the IRS should be excluded from the loss amount.

Defendant's theory is non-sensical for several reasons. First, under his theory of measuring loss, the loss would actually be zero. If Shumate were only borrowing money to which he was not entitled, and if his scheme had come to fruition, he would have been able to use the money for his own purposes for a time, then pay it all over to the IRS, resulting in no loss to the IRS. This cannot be the Guidelines' intention, and indeed, there is no support for it. His obligation as a payroll representative was to immediately pay over his clients' money, not to use it for awhile and then turn it over after he had diverted another client's funds. A defendant with the means to repay his victim should not be allowed to buy himself a lower sentence just because he made some restitution and is more well off than a similarly situated criminal.

Second, Shumate's view of his crimes fails to consider that his offenses fell into several categories. For example, in some instances where he eventually paid the IRS what it was due, he still had previously filed a false Form 941 (typically, understating the full amount collected from his

---

[2] Because Shumate has been repaying the IRS as he can, the restitution amount is lower than the loss amount, and now stands at $394,284.

client and due to the IRS). These false filings, whether or not accompanied by a loss to the IRS, still result in a Guidelines range that merits imprisonment.

Lastly, the fraud Guideline (§ 2B1.1) provides some guidance that supports the government's position. There, loss is measured as "the greater of actual loss or intended loss." *See* Comment 3(A).[3] As Shumate acknowledges, his crime is similar to embezzlement. Def. Mem. at 5. If he had embezzled the money, the applicable Guideline calculation would have been determined under § 2B1.1, which includes both categories of loss.

Shumate also argues that under the government's position, there is no benefit to him (under the Guidelines) for repaying the money he diverted for his own use. Def. Mem. at 4. This is incorrect. As discussed below, the fact that Shumate repaid some of the IRS' loss is a factor the court should consider under his personal characteristics pursuant to § 3553(a). He does accept that result at page 7 of his filing, but his hope of obtaining a lesser punishment because he was better at hiding his crimes, or because he had the financial means to repay some of the loss, should not be mitigating factors in determining his sentence.

*United States v. Mount*, 966 F.2d 262, 264 (7th Cir. 1992) supports the government's position. In *Mount*, the court fixed the loss amount at the victim's risk of non-payment. Here, too, the IRS risked non-payment every day Shumate lured it into thinking it had received 100% of the funds due to it, by filing false forms that under-reported the amounts due. In other words, Shumate is trying to limit his crimes to the ultimate amount the IRS was unable to collect. But the IRS was

---

[3] Shumate goes so far as to argue that if he had been financially able to repay 100% of the diverted funds, "the government would have received all of the withheld taxes without ever knowing Tom Shumate deferred payment of those taxes for personal reasons." Def. Mem. at 4. However, if the government had nonetheless uncovered his false filings, he is unlikely to have received the free pass he apparently would have sought.

7

unable to collect the full amount it was owed from the very moment Shumate filed false Forms 941 with the IRS, because it did not know at that time that Shumate had collected more money, and had just decided not to turn it over – despite that the false forms said he was doing so.

      **C.    A Sentence Within The Guidelines Range is Reasonable, But Not Greater Than Necessary Under 18 U.S.C. § 3553(a).**

Defendant is seeking a sentence of 18 to 24 months, which is below any range contemplated by the parties. The government is seeking a sentence within the range calculated in the PSR, or 46 to 57 months. The parties agree that Shumate surrendered early and has already served some of whatever sentence this court might impose. At sentencing, he will seek a short release so he can be designated to a non-County facility. The government has no objection.

The PSR sets forth many § 3553(a) facts which will not be repeated here. The government will also argue the § 3553(a) factors in more detail at the sentencing.

      **1.    Nature and Circumstances of the Offense**

Shumate's diversion of his clients' income had a significant impact on the IRS, in that it was deprived of funds owed to it. Perhaps more important, however, is that this is a tax offense with at least 34 other known victims who have suffered an actual loss. When Shumate failed to pay over the clients' payroll taxes, the IRS turned to the clients for collection. Some will have paid twice – first to Shumate, and now to the IRS. Moreover, they paid Shumate for the service he was supposedly rendering on their behalf, when he was instead stealing from them. As set forth in the reports of interview attached at Exhibit A and also previously tendered to this court, some of Shumate's clients have struggled financially because of his selfish criminal acts. Debbie Robinson's business, D&R, is no longer in business, partly due to Shumate's crimes. Christine Klemm said she

now has trouble trusting people she deals with professionally, and has also had to pay attorney's fees to resolve the tax issues caused by Shumate. Gary Grissom identified a list of ways Shumate's crimes have affected him and his business, and said he was "blind-sided" by the scheme. Susan Henrichs reported her business might be bankrupted in the end. All the interviewed victims said they were devastated, and felt cheated by someone they trusted.

In addition, Shumate's offense was aggravating in a number of ways. First, it continued over several years, and affected at least 34 victims. Second, the employees at the clients' companies had taxes withheld from their paychecks, and Shumate spent that money. Thus, there are additional, incidental victims, in that these people did not intend to give their money to Shumate, but rather to obey the law. Third, Shumate spent some of the diverted money on a very nice lifestyle. He bought an expensive home, belonged to several private country clubs, and owned nice vehicles. In short, he was diverting some of the money on his own indulgences. (This fact also applies to the court's consideration of Shumate's history and characteristics.)

      **2.**      **History and Characteristics of the Defendant**

The government agrees with defendant's mitigating factors set forth in its sentencing memorandum. Shumate did surrender early, he did attempt to resolve this case quickly (as soon as, though after, his conduct was discovered), and made as much restitution as possible. The government disagrees, however, that he should get any additional benefit for his attempt to provide information that might have led to investigations of some of his clients. The information has not led to additional prosecutions, and it has not led to any collection of unpaid taxes.

### 3. The Need for the Sentence

The court is directed under § 3553(a) to consider whether its sentence would serve certain needs enumerated in the statute. The government's position is that a Guidelines sentence would provide the deterrent effect discussed at length in the Guidelines Commentary and given deference in *Vucko*. Tax offenses often receive below-Guidelines sentences, in part because the most frequent victim of such crimes is the IRS, an organization which is admittedly not often sympathetic. However, other criminals and would-be criminals who are contemplating a diversion of funds for their own personal benefit are more likely to be deterred from such conduct if they learn they will pay a stiff price for it.

A Guidelines sentence should also specifically deter Shumate from again being tempted to steal money, even if he could again get away with it for awhile without being caught. This deterrence will have the added benefit of promoting respect for the law, and protecting the public who may later trust him again.

### 4. The Guidelines' Policy

In crafting an appropriate Guidelines range, the Sentencing Commission has considered many factors specific to tax offenses. Indeed, the introductory note to Section T states:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidences of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

2007 Guidelines, Introductory Commentary, at 308. A below-Guidelines sentence such as the one suggested by defendant is contrary to the policy considerations already made by the Sentencing Commission, and which should be considered by the court under § 3553(a).

     **5.    The Need for Restitution**

Shumate has turned over approximately $41,000 toward paying off the overall restitution owed to the IRS. He has also cooperated with the IRS in transferring almost $283,000 from his own company's tax liabilities to be applied to pay off his clients' debts. Shumate still owes $394,284, which he can pay off, according to a payment plan, when he is released after any sentence. While he has been on pre-sentence release awaiting sentencing, Shumate has not paid the IRS any portion of his salary.

**III.   Conclusion**

For the reasons set forth in this memorandum, the PSR, the Government's Version of Events and at sentencing, a sentence within the Guidelines is sufficient, but not greater than necessary, to comply with the factors set forth in 18 U.S.C. § 3553(a).

Dated: April 25, 2008

                                              Respectfully submitted,

                                              PATRICK J. FITZGERALD
                                              United States Attorney

                                              By: /s/ Lisa M. Noller
                                                  LISA M. NOLLER
                                                  Assistant United States Attorney
                                                  219 South Dearborn Street
                                                  Chicago, Illinois 60604
                                                  (312) 353-5314

**Certificate of Service**

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5 and the General Order on Electric Case Filing (ECF), that the United States' Response to Defendant's Sentencing Memorandum was served on Ted Sinars, pursuant to the district court's ECF system, on April 25, 2008.

> By: s/Lisa M. Noller
> LISA M. NOLLER
> Assistant United States Attorney
> 219 S. Dearborn Street
> 5th Floor
> Chicago, Illinois 60604
> (312) 353-5314